IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 19-cv-61053

UNITED STATES OF AMERICA )
*ex rel.* VERONICA N. ARVEN )
)
)
Relator, )
)
v. )
)
THE FLORIDA BIRTH-RELATED )
NEUROLOGICAL INJURY COMPENSATION )
ASSOCIATION )
)
and )
)
THE FLORIDA BIRTH-RELATED )
NEUROLOGICAL INJURY COMPENSATION )
PLAN )
)
Defendants. )
)

FILED BY _____ D.C.

APR 25 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. LAUD.

**FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(b)(2)**

## COMPLAINT

Relator Veronica (Roni) N. Arven, by and through undersigned counsel, brings this Complaint on her own behalf as well as on behalf of the United States pursuant to the *qui tam* provisions of the federal False Claims Act (31 U.S.C. § 3729 *et seq.*) against the Florida Birth-Related Neurological Injury Compensation Association ("the Florida Association") and the Florida Birth-Related Neurological Injury Compensation Plan ("the Florida Plan") (collectively, "NICA") and in support thereof states as follows:

14680/3/8835050v1

## BACKGROUND

1.     Relator brings this *qui tam* action on her own behalf as well as on behalf of the United States to recover treble damages, civil penalties, attorney's fees and costs for damages to the United States.

2.     In the late 1980's, Virginia was the first state in the United States to develop a neurological birth injury compensation fund completely removed from the common law tort system. Florida developed its own neurological birth injury compensation fund shortly thereafter. These funds remove the most complex medical malpractice claims from the tort system, providing an alternative means for compensating the participant for his or her birth-related neurological injuries. Florida and Virginia are the *only* two states in the United States to enact statutes creating birth-related neurological injury compensation funds.

3.     Roni Arven and Theodore (Ted) Arven, III (deceased) (collectively, "the Arvens") are the parents of Cody Arven, a minor child. Ted passed away suddenly on March 17, 2019. He was 50 years-old. At all times relevant to this Complaint, Cody Arven was a participant in the Virginia Birth-Related Neurological Injury Compensation Program ("the Virginia Program"), an independent entity created by the Virginia General Assembly in 1987. (The Virginia Program's enabling legislation is codified at Va. Code Ann. § 38.2-5000 *et seq.* ("Virginia Birth-Related Neurological Injury Compensation Act") (hereinafter "the Virginia Act")). In addition to being a participant in the Virginia Program, Cody became a Medicaid participant in 2014.

4.     Through the Arvens' experience with Cody as a participant simultaneously in both Medicaid and the Virginia Program, they learned that the Virginia Program was knowingly causing them and numerous other Virginia Program participants to submit false claims to Medicaid. By law, Medicaid is the "payer of last resort" for any and all healthcare claims for a covered

14680/3/8835050v1

beneficiary. Despite the clear requirements of federal law, the Virginia Program made itself the payer of last resort.

5. On July 7, 2015, the Arvens filed under seal a federal False Claims Act complaint against the Virginia Program in the Eastern District of Virginia, styled *United States ex rel. Theodore Arven, III and Veronica N. Arven v. The Virginia Birth-Related Neurological Injury Compensation Program*, 1:15cv870 ("the Virginia case"). The sealed Complaint was accompanied by a Material Disclosure Memorandum along with substantially all material evidence and information in the Arvens' possession. This material evidence referenced NICA (the Florida Association and Plan) and its nearly identical operation. Early on in the case, the Arvens, through counsel, alerted the Department of Justice to the likelihood that, as with the Virginia Program, NICA was causing Florida participants to submit false claims for payment to Medicaid. Following investigation by the Department of Justice with the Arvens' assistance, the United States settled the Virginia case with the Virginia Program effective September 12, 2018.

6. NICA was created by §§ 766.301-766.316, *Fla. Stat.*, on July 1, 1988, to provide care for children beginning in 1989 who meet the neurological birth-related injury criteria as defined therein. The purpose of NICA, according to § 766.301 of the NICA Statute as summarized in NICA's September 3, 2015 statement of Plan Policy, is to "(1) stabilize and reduce malpractice insurance premiums for providers of obstetric services in Florida; and (2) provide compensation, on a no-fault basis, for a limited class of catastrophic injuries [*i.e.,* birth-related neurological injuries] which result in unusually high costs for custodial care and rehabilitation."

7. As with the Virginia Program, NICA aims to keep malpractice insurance premiums low for obstetricians, other physicians, nurse midwives, and hospitals.

14680/3/8835050v1

8. Aside from an initial transfer from the Florida Department of Financial Services Insurance Regulatory Trust Fund when NICA was created, NICA is funded, like the Virginia Program, through assessments on obstetricians, other physicians, nurse midwives, and hospitals.

9. Over the past 30 years, NICA has kept its assessments low by declaring itself the "payer of last resort" and shifting much of the costs of care for NICA participants onto the Medicaid program -- just like the Virginia Program did (at least until the Arvens' False Claims Act suit). In fact, NICA's audited Financial Statements for the 2016 and 2017 fiscal years expressly acknowledged that "payments by Medicaid reduce the amount that would be paid by NICA otherwise[.]"

10. Therefore, as a self-proclaimed "payer of last resort," NICA has knowingly caused numerous NICA participants to submit false claims for payment to Medicaid that should have been paid by NICA.

11. Relator did not derive the allegations of wrongdoing by NICA set out herein from public disclosures, but rather through private correspondence and other communications in the Arvens' capacity as the parents of a claimant under the Virginia Program and through materials and other information received, reviewed and exchanged which specifically related to NICA during the course of the Arvens' investigation of the Virginia case.

12. The Arvens are the original source of the allegations and information in this Complaint. Relator states to the best of her knowledge that the allegations against NICA have not been publicly disclosed.

14680/3/8835050v1

## PARTIES

13. Relator is the mother of Cody Arven, a minor child. She resides at 1929 High Crest Court, Roanoke, Virginia 24012.

14. Relator's ex-husband, Theodore (Ted) Arven, III, resided at 721 Governor Morrison Street #645, Charlotte, North Carolina 28211, at the time of his death on March 17, 2019. Ted was Cody's father. Ted Arven's mother, Mary P. Arven, 3076 Streamhaven Drive, Indian Land, South Carolina 29707, is named in Ted's Will as the executor of his estate. Mary Arven is in the process of being qualified and appointed as executor of Ted's estate. Relator anticipates amending this Complaint to add Ted's estate, with Mary Arven as executor, as an additional relator.

15. At all times relevant to this Complaint, Cody Arven was a participant in the Virginia Birth-Related Neurological Injury Program (the "Virginia Program") and was also eligible for Medicaid. Because Cody is a minor child, the Arvens were and are responsible for his care and upkeep, including managing his health care needs, which includes interacting with the Virginia Program as well as Medicaid. Through those interactions, and information received and reviewed in connection with the investigation of the Arvens' 2015 False Claims Act case against the Virginia Program, the Arvens learned that Florida operated a neurological birth injury fund -- NICA -- very similar to the Virginia Program with a high likelihood that NICA had caused participants to submit false claims to Medicaid.

16. The Florida Birth-Related Neurological Injury Compensation Association ("the Florida Association") is an independent entity created by Florida Statute in 1988.

14680/3/8835050v1

17. The Florida Birth-Related Neurological Injury Compensation Plan ("the Florida Plan") is maintained by the Florida Association for the purpose of compensating individuals who sustained mentally and physically disabling neurological injuries at birth.

18. The Florida Association and Plan (collectively, "NICA") have their headquarters and principal place of business in Tallahassee, Florida.

19. The Florida Association and Plan each qualify as a "person" as that term is defined by the federal False Claims Act. Pursuant to §§ 766.303(3) and 766.31, *Fla. Stat.*, the Florida Association and Plan are properly subject to a federal False Claims Act lawsuit for causing participants to submit false claims for payment to Medicaid for care and services covered and payable by NICA.

20. According to the Florida Office of Insurance Regulation's *Review of Florida's Birth-Related Neurological Injury Compensation Association's Unpaid Loss and Defense Costs* (December 31, 2016), as of December 31, 2015, NICA had awarded benefits to a total of 351 claimants (29 new awards were made between September 30, 2014 and December 31, 2015 alone) throughout the State of Florida, including many within this District and within this Division.

21. In addition, NICA administers to numerous individuals who are not only NICA participants but who are also eligible for Medicaid – mirroring Cody Arven's situation in Virginia as described herein and in the Arvens' 2015 False Claims Act case against the Virginia Program.

## JURISDICTION AND VENUE

22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345, and 31 U.S.C. § 3732, which specifically confer jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

23. Venue is proper in this district pursuant to § 3732(a) of the False Claims Act. At all times relevant to this Complaint, NICA was administered to NICA participants throughout the State of Florida, including participants within this District, from its offices in Tallahassee, Florida. Additionally, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2),

24. Relator states that to the best of her knowledge none of the allegations against NICA contained in this Complaint have been publicly disclosed; however to the extent any of these allegations have been disclosed, the Arvens are the "original source" as defined in 31 U.S.C. § 3730(e)(4).

25. Relator has met all procedural requirements of 31 U.S.C. § 3730(b)(2).

## ALLEGATIONS COMMON TO ALL COUNTS

26. All of the preceding paragraphs are reincorporated by reference.

27. Cody Arven is the child of Ted and Veronica Arven. He was born on May 28, 2003, at Carilion Roanoke Community Hospital in Roanoke, Virginia.

28. In the months following his birth, Cody was evaluated via ultrasound and Magnetic Resonance Imaging (MRI). The MRI showed large bilateral areas of periventricular cyst formation in his brain, along with scattered smaller cysts throughout the remainder of his cortex. His doctor, Dr. Linda Krell, found that he suffered from severe bilateral cystic periventricular leukomalacia leading to spastic cerebral palsy.

29. Cody's treating physicians concluded that his condition was "birth-related" as defined by Va. Code Ann. § 38.2-5001. The Arvens therefore submitted a Virginia Birth-Related Neurological Injury Compensation Act Petition on Cody's behalf on December 28, 2006. The Program concluded that Cody Arven met the requirements for eligibility under the Birth-Related Injury Act.

30. As a result of their son's admission to the Program, the Arvens received information and correspondence related to the Virginia Program and its functions. The Arvens have managed their son's participation in the Virginia Program from the date of his entry.

### RELATOR HAS SPECIALIZED KNOWLEDGE OF THE FALSE CLAIMS THAT NICA HAS CAUSED PARTICIPANTS TO SUBMIT TO MEDICAID

31. After Cody Arven was admitted to the Virginia Program in 2007, the Arvens were directed to apply for Medicaid. They were directed to do this by George Deebo, the Executive Director of the Fund.

32. At that time, the Arven family was not on Medicaid and they told Deebo as much.

33. Nevertheless, Deebo instructed the Arvens to apply for Medicaid just in case they might be eligible for some benefits. Deebo further told the Arvens that the Virginia Program encouraged its families to apply for and if possible receive Medicaid so that the Medicaid program would cover expenses instead of the Program.

34. Years later, in 2014, the Arven family did in fact become eligible for Medicaid.

35. At that time, they were again directed to submit claims related to Cody's healthcare to Medicaid instead of to the Virginia Program.

36. The Arven family did as they were told, and the resulting claims were false. These false claims were submitted by the Arvens only because Deebo and others at the Virginia Program directed them to do so.

37. Relator has specific knowledge that this scheme was widespread and that other Virginia Program participants followed Deebo's instruction to try and obtain Medicaid.

38. As a result, the Arvens brought their False Claims Act case against the Virginia Program in 2015 (the Virginia case). In the course of investigating the Virginia case and prior to filing suit, the Arvens learned that Florida was the only other state in the nation that maintained a

neurological birth-injury compensation fund. The Arvens further learned through investigation that the Florida fund, NICA, operated in nearly identical fashion to the Virginia Program and likely caused participants to submit false claims to Medicaid just like Deebo and others at the Virginia Program had caused the Arvens to submit.

## COUNT ONE

### VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)
### CAUSING THE SUBMISSION OF FALSE CLAIMS TO THE UNITED STATES
### (AGAINST BOTH DEFENDANTS)

39. Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 38 of this Complaint.

40. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as amended.

41. The scheme perpetrated by NICA in Florida to cause NICA participants to submit false claims for payment by Medicaid was identical, in all material respects, to the scheme perpetrated by the Virginia Program which was the subject of the Arvens' False Claims Act suit in the Eastern District of Virginia.

42. Medicaid is a state and federal assistance program that pays medical expenses for low-income patients. Medicaid was created in 1965 in Title XIX of the Social Security Act. Funding for Medicaid is shared between the Federal Government and those states participating in the program.

43. In Florida, the Medicaid program is funded with approximately 61% federal funds and 39% funds from the state and local governments or taxes on health care providers such as hospitals and nursing homes.

44. Medicaid is always the "payer of last resort" as a matter of law. In other words, if a Medicaid participant obtains treatment for which an insurance company or some other third-party is liable, Medicaid will not pay for the care; alternatively, if a third party is liable to pay for part of a Medicaid participant's care, Medicaid will only pay that part of the care which is over and above the amount covered by the third party.

45. The text of § 766.31(1)(a)(1) and (a)(3), *Fla. Stat.*, specifically provide that NICA will not cover any items or services for which the participant has received or is entitled receive payment or reimbursement "under the laws of any state or the Federal Government, except to the extent such exclusion may be prohibited by federal law."

46. The exclusion of Medicaid eligible items or services from payment by NICA is prohibited by federal law.

47. The current Medicaid statute, as amended in 2006, is found at 42 U.S.C. §1396a(a)(25)(A)-(B) and requires Florida, as a state which receives federal funds for Medicaid, to "take all reasonable measures to ascertain the legal liability of third parties ... to pay for care and services available under the plan," and requires states to "seek reimbursement from the third party," and to "prohibit any health insurer (including ... [a] party that is, by statute, contract, or agreement, legally responsible for payment of a claim...) from taking into account that the individual is eligible for or is provided medical assistance under a plan under this title."

48. NICA, however, expressly takes into account a participant's Medicaid status. NICA's September 3, 2015 statement of plan policy found at page 3 of the current *NICA Benefit Handbook* reads: "the Plan is the payer of last resort; that is, the Plan pays after available or governmental programs have paid for such medically necessary and reasonable expenses."

14680/3/8835050v1

49. Procedures for filing a NICA claim for benefits are found on pages 16 and 17 of the *Benefit Handbook*. These procedures state that "documentation of applicable private or government sources of services or reimbursement relative to the Petition shall be provided to NICA. See Section 766.305, Florida Statutes, for specifics."

50. Under the heading "Insurance" on page 17 of the *Benefit Handbook*, NICA reiterates: "The Plan is the payer of last resort." But, by definition, there cannot be two payers of last resort. Federal law dictates that Medicaid, not NICA, is the payer of last resort.

51. Regarding insurance, the NICA *Benefit Handbook* continues (on pages 17-18):

**[T]he Plan must be provided with a copy of the NICA covered individual's health insurance policy, if there is one, and Medicaid/Medicare eligibility before benefits can be paid from the Plan.** It is the responsibility of the parents or legal guardians to seek benefits from other sources which they are eligible. **The Plan may not reimburse or may reimburse at a lower amount for benefits that the child would be eligible for under an insurance policy or program when the parent or legal guardian refuses to seek those benefits.** (Emphases added).

52. Despite the clear requirements of federal law set out in the Medicaid statute and establishing Medicaid's status as payer of last resort, defendants have knowingly caused numerous NICA participants across the state of Florida to submit false and/or fraudulent claims to the Florida Medicaid program. Indeed, at least since the Medicaid statute was amended in 2006, every claim submitted by a NICA participant to Medicaid for items or services payable by NICA represents a false and/or fraudulent claim which NICA knowingly caused to be submitted.

53. As a result, the United States has been damaged.

54. Thus, Defendants violated the False Claims Act, in that they knowingly caused to be presented false or fraudulent claims for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

14680/3/8835050v1

## Prayer for Relief

WHEREFORE, Relator prays for judgment against Defendants as follows:

i. That Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

ii. That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' actions, as well as the maximum civil penalty against the Defendants for each violation of 31 U.S.C. § 3729;

iii. That the Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the Civil False Claims Act;

iv. That the Relator be awarded all costs and expenses of this action, including attorneys' fees; and

v. That the United States and the Relator receive all such other relief as the Court deems just and proper.

## Jury Demand

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

DATED: April 25, 2019

**RESPECTFULLY SUBMITTED:**

GENTRY LOCKE

*/s/ E. Scott Austin*

E. Scott Austin (VSB No. 41260)*
Evans G. Edwards (VSB No. 79588)*
10 Franklin Road, SE
Suite 900
Roanoke, Virginia 24011
Phone: (540) 983-9300
Fax: (540) 983-9400
Email: saustin@gentrylocke.com
          edwards@gentrylocke.com


NICHOLSON & EASTIN, LLP

*/s/ Robert N. Nicholson*

Robert N. Nicholson (Fla Bar No. 933996)
Parker D. Eastin (Fla Bar No. 48044)
Nicholson & Eastin, LLP
707 N.E. Third Avenue
Suite 301
Fort Lauderdale, FL 33304
Phone: (954) 634-4400
Fax: (954) 634-4418
Email: Robert@NicholsonEastin.com
       Parker@NicholsonEastin.com

---

*Admission pro hac vice to be applied for in the Southern District of Florida.