# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

FILED BY _____ KP _____ D.C.

Jul 29, 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 29, 2022

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  20-13448-BB
Case Style: USA, et al v. The Florida Birth-Related, et al
District Court Docket No: 0:19-cv-61053-WPD

Enclosed is the Bill of Costs.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's
decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision
was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion
was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to:  Lois Tunstall
Phone #:  (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-13448

_____

UNITED STATES OF AMERICA,
VERONICA N. ARVEN, ESTATE OF THEODORE ARVEN, III

Plaintiffs-Appellees,

*versus*

FLORIDA BIRTH-RELATED NEUROLOGICAL INJURY COMPENSATION ASSOCIATION,
THE FLORIDA BIRTH-RELATED NEUROLOGICAL INJURY COMPENSATION PLAN,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cv-61053-WPD

ISSUED AS MANDATE:  07/29/2022

2                                                              20-13448

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion is-
sued on this date in this appeal is entered as the judgment of this
Court.

Entered: April 21, 2022

For the Court: DAVID J. SMITH, Clerk of Court

**UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**
**Bill of Costs**

Court of Appeals Docket No. __20-13448__

United States of America *ex rel.*,
Veronica N. Arven and Estate of Theodore Arven, III       vs.

The Florida Birth-Related Neurological Injury Compensation Association
and The Florida Birth-Related Neurological Injury Compensation Plan

A Bill of Costs should only be filed when the Clerk's Office has advised a party that the party is entitled to costs. FRAP 39 and 11th Cir. R. 39-1 govern costs taxable in this court and the time for filing the Bill of Costs. A motion for leave to file out of time is required for a Bill of Costs not timely received.

### INSTRUCTIONS

The appellate docketing fee is set in the fee schedule issued pursuant to 28 U.S.C. § 1913. However, the $5 fee for filing a notice of appeal is recoverable as a cost in the district court. In the grid below, multiply the number of original pages of each document by the total number of documents reproduced to calculate the total number of copies reproduced. Multiply this number by the cost per copy ( $.15 per copy for "In-House", up to $.25 per copy for commercial reproduction, supported by receipts) showing the product as costs requested.

| | Repro. Method (Mark One) In-House | Comm* | No. of Original Pages | Total No. Documents Reproduced | Total No. of Copies | COSTS REQUESTED | CT. USE ONLY COSTS ALLOWED |
|---|---|---|---|---|---|---|---|
| Appellate Docketing Fee | — | — | — | — | — | | |
| Appellant's Brief | | | | | | | |
| Appendix | | | | | | | |
| Appellee's Brief | | X | 88 | 11 | 968 | $242 | $242.00 |
| Reply Brief | | | | | | | |
| Supplemental Appendix | | X | 199 | 8 | 1592 | $398 | $398.00 |
| | | | | | | | |
| *Note: If reproduction was done commercially, receipt(s) must be attached. | | Invoices attached | | | **TOTAL** 2560 | $ 640 REQUESTED | $ 640.00 ALLOWED |

I hereby swear or affirm that the costs claimed were actually and necessarily incurred in this appeal and that I have served this Bill of Costs on counsel/parties of record.

Signature: _/s/ Michael J. Finney_       Date Signed: 5/5/2022

Attorney Name: Michael J. Finney       Attorney for: Appellees
(Type or print your name)       (Type or print name of client)

E-mail: finney@gentrylocke.com       Phone: (540) 983-9300

Street Address/City/State/Zip: 10 Franklin Rd., S.E., Suite 900 (P.O. Box 40013)
Roanoke, Virginia 24022-0013

### FOR COURT USE ONLY

Costs are hereby taxed in the amount of $ ___$640.00___ against ___Appellants___

and are payable directly to ___Appellee___

David J. Smith, Clerk of Court

Issued on: _____       By: _/S/ Tresa A. Porter_       DATE: 5/10/2022
Deputy Clerk

BOC Rev.: 6/17

[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-13448

_____

UNITED STATES OF AMERICA,
VERONICA N. ARVEN, ESTATE OF THEODORE ARVEN, III

Plaintiffs-Appellees,

*versus*

FLORIDA BIRTH-RELATED NEUROLOGICAL INJURY
COMPENSATION ASSOCIATION,
THE FLORIDA BIRTH-RELATED NEUROLOGICAL INJURY
COMPENSATION PLAN,

Defendants-Appellants.

———————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cv-61053-WPD

———————————————

Before WILSON, ROSENBAUM, Circuit Judges, and COVINGTON,* District Judge.

PER CURIAM:

In 1988, the Florida legislature found that obstetricians were "high-risk medical specialists for whom malpractice insurance premiums are very costly." Fla. Stat. § 766.301(1)(a). So it created the Florida Birth-Related Neurological Injury Compensation Association ("Association"), which administers the Florida Birth-Related Neurological Injury Compensation Plan ("Plan") (together, "NICA"). With NICA, the legislature established a no-fault system of compensation "for a limited class of catastrophic injuries that result in unusually high costs for custodial care and rehabilitation." *Id.* § 766.301(2).

—————————

* The Honorable Virginia Covington, United States District Judge for the Middle District of Florida, sitting by designation.

The Relators, Roni and Ted Arven,[1] sued NICA under the False Claims Act ("FCA") alleging that NICA violated federal law by considering itself, rather than Medicaid, the payor of last resort. As a result of NICA's treatment of itself as the payor of last resort, the Arvens asserted, Medicaid wound up having to pay more for claims than it otherwise would have. NICA moved to dismiss. It argued that it was not a "person" under the FCA and that it was entitled to Eleventh Amendment immunity because NICA is an arm of the state of Florida. The district court denied the motion, concluding that NICA is not an arm of the state. We agree and now affirm.

## BACKGROUND

### A. The Plan

Here's how NICA works: obstetricians in Florida may choose to belong to the Plan, which shields them from medical-malpractice liability in covered circumstances. *See* Fla. Stat. § 766.314(4)(c). If they do, they pay to the Plan an initial "assessment" and then an annual assessment every year after that. *Id.* § 766.314(4)(c), (5)(a). In addition, most licensed physicians in Florida—whether obstetricians or not—must pay a base assessment

---

[1] Ted Arven died shortly before the Arvens filed their original complaint, so his estate is a plaintiff in the litigation.

and then an annual assessment every year thereafter.[2]  *Id.* §
766.314(4)(b), (5)(a).  And finally, licensed hospitals must pay assessments per infant delivered in the hospital.  *Id.* § 766.314(4)(a).
These assessments (and income generated from investing them)
primarily fund the Plan.

If a baby that a participating obstetrician delivers sustains a
"birth-related neurological injury,"[3] then the baby's parents may
file with NICA a claim for compensation.  *Id.* §§ 766.302(3);
766.305(1).  The claim is exclusive of all other tort remedies.[4]  An
administrative law judge ("ALJ") determines whether compensation from the Plan is warranted.  *Id.* § 766.304.  Because entitlement
to compensation is on a no-fault basis, the claimant must show only
that (1) the infant sustained a birth-related neurological injury, and

---

[2] Certain retired, government, and instructional and training physicians are
exempt.  *See* Fla. Stat. § 766.314(4)(b)4.

[3] A "birth-related neurological injury" is an "injury to the brain or spinal cord
of a live infant weighing at least 2,500 grams for a single gestation or, in the
case of a multiple gestation, a live infant weighing at least 2,000 grams at birth
caused by oxygen deprivation or mechanical injury occurring in the course of
labor, delivery, or resuscitation in the immediate postdelivery period in a hospital, which renders the infant permanently and substantially mentally and
physically impaired. This definition shall apply to live births only and shall not
include disability or death caused by genetic or congenital abnormality."  Fla.
Stat. § 766.302(2).

[4] The exception to this is "where there is clear and convincing evidence of bad
faith or malicious purpose or willful and wanton disregard of human rights,
safety, or property."  Fla. Stat. § 766.303(2).  In that case, the parents may sue
as long as they do so before and instead of filing a claim with NICA.  *Id.*

(2) obstetrical services were delivered at birth by a physician participating in the Plan. *Id.* § 766.309(1)(a)–(b). Compensation includes "[a]ctual expenses for medically necessary and reasonable medical and hospital, habilitative and training, family residential or custodial care, professional residential, and custodial care and service, for medically necessary drugs, special equipment, and facilities, and for related travel." *Id.* § 766.31(1)(a).

When it created the Plan, the Florida legislature appropriated $20 million from the Insurance Commissioner's Regulatory Trust Fund to fund the Plan. 1988 Fla. Sess. Law Serv. 88-1. Since then, the Plan has been funded exclusively through the assessments and investment income. The Plan is the actual pool of money that pays claims. *See* Fla. Stat. § 766.302(8).

The Association, which administers the Plan, is "not a state agency, board, or commission," but may use the state seal. *Id.* §§ 766.302(1), 766.315(1)(a). It consists of a board of seven directors. *Id.* § 766.315. Florida's Chief Financial Officer appoints the directors to staggered three-year terms.[5] *Id.* § 766.315(1)(b)–(c). The Governor and the CFO both have the power to remove a director "for misconduct, malfeasance, misfeasance, or neglect of duty in office" only. *Id.* § 766.315(2)(c). Meetings of the Association are subject to the Florida public-meetings laws, and the Office of

---

[5] Florida's Chief Financial Officer (CFO) is a constitutional officer elected in statewide elections. Fla. Const. art IV, § 4.

Insurance Regulation or the Joint Legislative Auditing Committee may audit the Plan at any time.  *See id.* § 766.315(5).[6]

The Association may invest Plan funds, subject to certain limitations.  *Id.* § 766.315(5)(f).  At the end of fiscal year 2019, the Plan had about $1.346 billion in total assets, and its net position accounting for liabilities was about $393 million.  If the Plan funds ever become "insufficient to maintain the plan on an actuarially sound basis," the Insurance Regulatory Trust Fund may transfer an additional $20 million to the Association.  *Id.* § 766.314(5)(b).  All "[f]unds held on behalf of the plan are funds of the State of Florida."  *Id.* § 766.315(5)(f).  A statutory provision waives sovereign immunity for the Association "solely to the extent necessary to assure payment of compensation."  *Id.* § 766.303(3).

## B.  *The Lawsuit*

The Arvens are the parents of Cody Arven, a child who participated in the Virginia Birth-Related Neurological Injury Compensation Program, which was created shortly before Florida's NICA was created.  The Arvens brought a qui tam against the Virginia program in 2015 after they discovered that that program

---

[6] The CFO's power to remove and the open-meetings-Act requirements were recently added, through legislation signed into law June 21, 2021.  The Arvens argue that these changes should not be considered when determining whether NICA is an arm of the state because they occurred after the actions at issue here.  As we explain below, even considering the changes, we conclude that NICA is not an arm of the state, so we need not resolve the dispute over whether the changes should be considered.

required its participants to submit healthcare claims to Medicaid before submitting claims to the Virginia program. In 2018, Virginia settled with the United States for about $20 million, of which the Arvens received about $4 million.

Then, the Arvens brought the same suit against NICA in April 2019. Their amended complaint alleges that NICA, like the Virginia program, violated federal law by considering itself, rather than Medicaid, the payor of last resort. The United States opted not to intervene.

NICA moved to dismiss, arguing, among other things, that NICA is an arm of the state, so it is not a "person" for FCA purposes and is entitled to Eleventh Amendment immunity. Despite not intervening, the government filed a "statement of interest" arguing that NICA is not an arm of the state of Florida. After considering full briefing on the motion and the government's statement, the district court denied the motion to dismiss. NICA appealed under the collateral-order doctrine, which recognizes that the denial of a claim of Eleventh Amendment immunity is immediately appealable. *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144–45 (1993).[7]

---

[7] The parties originally disputed on appeal whether the district court's order denied immunity to both the Plan and Association, or just the Association. In their brief, the Arvens have now changed their position on jurisdiction and say they "do not object to construing any record ambiguity in favor of the conclusion that the district court denied immunity as to the Plan." In any event, the Court may consider the Plan's immunity even if the Plan did not preserve it

## STANDARD OF REVIEW

Whether an entity constitutes an arm of the state under the Eleventh Amendment immunity analysis is a question of law subject to de novo review. *U.S. ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 602 (11th Cir. 2014).

## DISCUSSION

As relevant here, the FCA subjects to liability "[a]ny person" who, among other things, "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a). So the Association and the Plan can be liable under the FCA only if they qualify as "persons."

The Supreme Court has held that states and agencies acting as arms of the state are not "persons" for purposes of FCA qui tam liability. *See Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 788 (2000). We have further clarified that, because the scope of each inquiry is the same, "courts should employ the Eleventh Amendment arm of the state analysis to determine whether a

---

in the district court. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1332 (11th Cir. 2004) (principle that Court will not entertain new arguments on appeal is not jurisdictional). In addition, the doctrine of pendent appellate jurisdiction allows us to consider otherwise-unreviewable questions that are inextricably intertwined with an issue that is reviewable. *See Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1335 (11th Cir. 1999). For these reasons, we review the Eleventh Amendment immunity and "person" status under the FCA for both the Association and the Plan.

state entity is a 'person' subject to FCA liability." *Lesinski*, 739 F.3d at 602.

In the Eleventh Circuit, to determine whether an entity is an arm of the state, we use the *Manders* factors. *See Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003). Those factors include the following: (1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity. *Lesinski*, 739 F.3d at 602. We apply each factor in turn.

## I.   How Florida Law Defines NICA

Whether an entity is an arm of the state ultimately presents a question of federal law. But we determine that answer "by carefully reviewing how the agency is defined by state law." *Versiglio v. Bd. of Dental Exam'rs of Ala.*, 686 F.3d 1290, 1291 (11th Cir. 2012). "The state law provides assistance in ascertaining whether the state intended to create an entity comparable to a county or municipality or one designed to take advantage of the state's Eleventh Amendment immunity." *Tuveson v. Fla. Governor's Council on Indian Affs., Inc.*, 734 F.2d 730, 732 (11th Cir. 1984).

In ascertaining how the state treats the Association and the Plan, we look to both state-court precedent and legislative clues. We begin with state-court precedent.

In *Coy v. Florida Birth-Related Neurological Injury Compensation Plan*, 595 So. 2d 943 (Fla. 1992), a group of non-obstetrician physicians challenged the annual assessment they must pay to

NICA.  The Florida Supreme Court characterized NICA as "a governmental enterprise, i.e., a state-created system for compensating certain individuals for certain types of birth-related injuries." *Coy*, 595 So. 2d at 945.  It then held that the assessments qualified as "taxes" under Florida law, but that the taxes were valid.  *Id.*; *id.* at 948.  And in *Samples v. Florida Birth-Related Neurological Injury Compensation Association*, 114 So. 3d 912, 917 (Fla. 2013), the Florida Supreme Court, in passing, called NICA a "state program" while upholding an award maximum.  These cases tend to support the notion that Florida courts treat NICA as an arm of the state.

Next, we consider any insight the Florida legislature may have provided.  The Florida legislature enacted a provision stating that "[s]overeign immunity is hereby waived on behalf of the [Association] solely to the extent necessary to assure payment of compensation [by the Plan]."  Fla. Stat. § 766.303(3).

NICA argues that this shows that the Florida legislature believed it was creating a state entity that had sovereign immunity, or else there would have been nothing to waive.  In response, the Arvens assert that NICA conflates sovereign immunity from suit in state court with Eleventh Amendment immunity from suit in federal court.  The Arvens, of course, are right that "the Eleventh Amendment deals only with federal jurisdiction to hear suits against the state, not with the state's immunity from suit in any forum." *Hufford v. Rodgers*, 912 F.2d 1338, 1340–41 (11th Cir. 1990) (alteration omitted).  But that does not mean the state statute has no significance.

Here, though, the Florida legislature sent some mixed signals. On the one hand, the statute suggests the Florida legislature may have intended to create an arm of the state when it devised NICA. This logic especially makes sense when we remember that we're using the *Manders* factors to determine whether NICA is a "person" under the FCA, not necessarily whether NICA is entitled to Eleventh Amendment immunity.

But on the other hand, the Florida legislature characterized NICA as "not a state agency, board, or commission." Fla. Stat. § 766.315(1)(a). This language tends to support the idea that Florida doesn't consider NICA an arm of the state.

Nevertheless, there's no bright-line rule that an entity must be characterized as an agency, board, or commission to be an arm of the state. *See, e.g.*, *Lesinski*, 739 F.3d at 606 (holding that the South Florida Water Management District was an arm of the state). In Florida's False Claims Act, for example, "State" is defined as "the government of the state or any department, division, bureau, commission, regional planning agency, board, district, authority, agency, or other instrumentality of the state." Fla. Stat. § 68.082(1)(f).

On balance, we conclude this factor supports finding that NICA is an arm of the state.

## II.   The Degree of Control Florida Maintains Over NICA

Next, we review the degree of control Florida maintains over NICA. That is, we consider whether the legislature retained authority over NICA or whether it is instead more autonomous.

NICA argues that Florida exercises substantial control over NICA for two primary reasons: (1) Florida's CFO appoints the members of the Association, and (2) Florida statutes carefully prescribe all NICA's operational aspects. We disagree.

In *Lesinski*, we found that state control of the Water District was "pervasive and substantial" where several conditions existed: the District was governed by a board whose members and Executive Director were appointed by the Governor and approved by the Florida Senate; the Governor was empowered to remove any officer of the District; the District's budget had to be submitted to the Governor, Senate President, Speaker of the House, the Secretary of the Department of Environmental Protection, and various legislative committees; the District's budget was subject to approval by the Governor; and the Florida Land and Water Adjudicatory Commission had the exclusive authority to review the District's rules. *Lesinski*, 739 F.3d at 603.

NICA has some of these qualities, but it lacks others. Its board is appointed by Florida's CFO, who is a constitutional officer elected state-wide, like the Governor. But Florida's Senate does not have the power to approve (or disapprove) NICA's board members. And the Governor and CFO can remove board directors only "for misconduct, malfeasance, misfeasance, or neglect of duty in office," Fla. Stat. § 766.315(2)(c)—in other words, only "for

cause." That is a significant limitation on the Governor's and CFO's removal power. *Cf. Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2198 (2020) (discussing importance of President's unfettered removal powers).

As for the review of NICA's rules, NICA doesn't make any rules for anyone to review, but it is required to annually submit audited financials to the Florida Joint Legislative Auditing Committee and the Office of Insurance Regulation, both of which may audit NICA whenever they wish. Fla. Stat. § 766.315(5)(e). And since November 2021, NICA has been required to annually submit a report with information about claimants and compensation to the Governor, President of the Senate, Speaker of the House, and CFO. *Id.* § 766.315(8). But unlike with the Water District in *Lesinski*, NICA doesn't have to get its budget approved by anyone.

And NICA is greatly autonomous when it comes to its day-to-day operations of administering claims. The board of directors of NICA has the following enumerated powers:

(a) Administer the plan.

(b) Administer the funds collected on behalf of the plan.

(c) Administer the payment of claims on behalf of the plan.

(d) Direct the investment and reinvestment of any surplus funds over losses and expenses, if any

investment income generated thereby remains cred-
ited to the plan.

(e) Reinsure the risks of the plan in whole or in part.

(f) Sue and be sued, and appear and defend, in all ac-
tions and proceedings in its name to the same extent
as a natural person.

(g) Have and exercise all powers necessary or conven-
ient to effect any or all of the purposes for which the
plan is created.

(h) Enter into such contracts as are necessary or
proper to administer the plan.

(i) Employ or retain such persons as are necessary to
perform the administrative and financial transactions
and responsibilities of the plan and to perform other
necessary and proper functions not prohibited by law.

(j) Take such legal action as may be necessary to avoid
payment of improper claims.

(k) Indemnify any employee, agent, member of the
board of directors or alternate thereof, or person act-
ing on behalf of the plan in an official capacity . . . .

*Id.* § 766.315(4)(a)–(k).  It also chooses how to invest the Plan's
funds, subject to statutory limitations.  *Id.* § 766.315(5)(f).

The legislature always has to delegate some authority and
power to agencies for them to work.  But when the legislature does

so to such a significant degree as it has here, that militates in favor of the conclusion that the entity is autonomous. So this factor weighs against finding that NICA is an arm of the state.

## III.   Where NICA derives its funds

Next, the Court must determine "the source of [NICA's] funding." *Manders*, 338 F.3d at 1344. When it was created, NICA received an initial $20 million appropriation and has since been funded exclusively by assessments and investment income. The legislature set aside an additional $20 million reserve in the state Insurance Regulatory Trust Fund to be used if NICA ever becomes not actuarially sound. Fla. Stat. § 766.314(5)(b). And as we have noted, Florida statutes provide that "[f]unds held on behalf of the plan are funds of the State of Florida." *Id.* § 766.315(5)(f).

NICA argues that it is funded "exclusively by the State." It cites to *Williams v. District Board of Trustees of Edison Community College, Florida*, 421 F.3d 1190, 1194 (11th Cir. 2005), to show that state funding points to a finding that an entity is an arm of the state. [*Id.*]. While that proposition is no doubt true, the *Williams* Court focused more on the fact that the state had to approve the budget of the community college there in determining that this factor weighed in favor of finding that it was an arm of the state. 421 F.3d at 1194. It acknowledged, "Although [the community college] is not exclusively funded by the state, state approval of institutional budgets evidences state control." *Id.* But as we have noted, NICA's budget is *not* subject to state approval.

Next, we consider the role the assessments play in funding NICA—both the mandatory ones that all physicians must pay and the voluntary ones that obstetricians pay to participate in the Plan. In *Coy*, the Florida Supreme Court considered whether the mandatory assessments were valid and decided they were valid "taxes" under state law.  *See Coy*, 595 So. 2d at 945.  The court did not specifically consider the nature of the voluntary assessments.  But we note that all the assessments are paid directly to NICA, never passing though the State treasury.  Fla. Stat. § 766.314(3).

NICA argues that the rationale of *Coy* applies to both the mandatory and voluntary assessments; they are all "taxes," so NICA is state-funded.  We disagree.  In holding that the mandatory assessments were taxes, the *Coy* court explained,

> Initially, we find that the [mandatory] $250 assessment in this case constitutes a "tax" within the meaning of Florida law.  In the past, we have defined a tax as an *enforced pecuniary burden* laid on individuals or property to support government. . . . Here, the $250 assessment *is levied* upon physicians to support a governmental enterprise, i.e., a state-created system for compensating certain individuals for certain types of birth-related injuries.  The assessment is collected under authority of state law, and the Plan can sue to enforce the assessment. . . .  It thus is a tax and is subject to the requirements of law applicable to taxes.

20-13448 Opinion of the Court 17

595 So. 2d at 945 (emphases added). Both assessments are of course "collected under authority of state law," but the voluntary assessments are not "enforced" or "levied." They are voluntary for obstetricians who would prefer the no-fault liability system to regular tort liability. If an obstetrician doesn't want to pay the assessment and participate in NICA, she isn't obligated to do so. So the *Coy* court's reasoning for characterizing the mandatory payments as "taxes" does not apply to the obstetricians' payments. Nor is it even consistent with the common sense understanding of "taxes" as mandatory. Rather, as the district court found, the voluntary assessments are more like insurance premiums that the obstetricians would otherwise pay to a malpractice insurer than they are like taxes. Providing insurance is traditionally a private enterprise, so the government's decision to wade into that field suggests that NICA does not act as an arm of the state.

In any event, NICA is funded far more by its investment income than by assessments. In 2019, NICA earned more than $103 million from its investments, which was almost 4 times its revenue from assessments. The Arvens argue that this makes this factor weigh against finding that NICA is an arm of the state. NICA responds that the initial appropriation and the assessments are state funds, and they generated the investment income, so the investment income shouldn't weigh against an arm-of-the-state finding.

We are not persuaded. In *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30 (1994), the Supreme Court considered whether the Port Authority Trans-Hudson Corporation was an

arm of the state and enjoyed Eleventh Amendment immunity. It concluded it did not. In reaching this decision, the Court noted that the Port Authority had once received appropriations from the states but hadn't for a long time because it was so well-funded by its investment income, tolls, and fees. Indeed, the Court observed that the Port Authority was "[c]onceived as a fiscally independent entity financed predominantly by private funds, . . . [so] the Authority generate[d] its own revenues, and for decades ha[d] received no money from the States." *Hess*, 513 U.S. at 45. We also emphasized this point in *Manders*, when we distinguished *Hess*. We explained that the Port Authority "was financially independent, with funds from private investors, tolls, fees, and investment income." *Manders*, 338 F.3d at 1325 (citing *Hess*, 513 U.S. at 36, 49–50).

To be sure, NICA differs from the Port Authority in that, at one point, the Port Authority (unlike NICA) had also been funded by private investors. But that's not what the Supreme Court found significant. Rather, when the Supreme Court concluded that the Port Authority was not an arm of the state, the Court emphasized that the Port Authority "generate[d] its own revenues" and "for decades ha[d] received no money from the States," *Hess*, 513 U.S. at 45. As we have explained, NICA shares these qualities.

So on balance, this factor weighs against a finding that NICA is an arm of the state. NICA's budget is not subject to approval by the state (like the budget in *Williams*, 421 F.3d at 1194), the voluntary assessments NICA collects are more like malpractice insurance

premiums (which are traditionally collected by private insurance companies) than like taxes, and NICA's primary source of funding comes from investment income rather than state funds (like for the Port Authority in *Hess*, 513 U.S. at 45).

## IV.   Who Is Responsible for Judgments Against NICA?

Last, and "most important," *Freyre v. Chronister*, 910 F.3d 1371, 1384 (11th Cir. 2018), we must determine whether Florida's state treasury would have to pay a judgment against NICA. *See Manders*, 338 F.3d at 1324–27.

NICA argues that, because its funds are "funds of the State of Florida," Fla. Stat. § 766.315(5)(f), any judgment against NICA is necessarily against the state. It also argues that if "judgments against NICA become large enough, the State would be able to preserve the Plan's actuarial soundness only by raising the taxes which fund the Plan or appropriating general treasury funds." In support, NICA relies on *Lesinski*. There, we held that a judgment against the South Florida Water Management District implicated the state's treasury because "[s]hould judgment creditors deplete the District's funds to the point that it can no longer effectively function, the State would ultimately have to choose between increasing its appropriation to make up the shortfall or shirking its constitutionally mandated duty to 'conserve and protect [the State's] natural resources and scenic beauty.'" 739 F.3d at 605.

We do not agree with NICA's conclusion. For starters, the mere fact that the legislature called NICA's funds the state's funds

in a statute can't circumvent the *Manders*-factors analysis if a functional analysis of the reality shows that the state is not responsible for judgments against NICA. So the language from the Florida statute isn't dispositive.

And here, NICA's argument that the state treasury would have to step in if the judgment is large enough is too speculative. That contention ignores NICA's very solvent position. Indeed, it's unlikely that the judgments would ever be high enough to drain all NICA's funds. But perhaps even more significantly, we don't even know whether the state would pay the judgments if NICA didn't have enough money. Based on the information submitted by the parties, it's just as likely that the legislature would let NICA go insolvent and abandon the whole program. Unlike in *Lesinski*, the state's under no constitutional duty to operate NICA.

Other circuits have also rejected reasoning much like NICA's. *See Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 75 (1st Cir. 2003) ("In the end, [the entity's] argument is simply that a judgment would deplete its operating funds, that the Commonwealth might choose to rescue it, and that this would indirectly deplete the state treasury. We rejected this very argument [previously], and do so here."); *Bolden v. Se. Pa. Transp. Auth.*, 953 F.2d 807, 819 (3d Cir. 1991) ("discretionary subsidies [by the state] committed in reaction to a judgment, however, would not necessarily transform the recipients into alter egos of the state").

In short, this factor weighs against finding that NICA is an arm of the state.

## CONCLUSION

In sum, one *Manders* factor points towards finding that NICA is an arm of the state and three factors—including the most important one—weigh against that conclusion. We therefore hold that NICA has failed to show that it is an arm of the state entitled to Eleventh Amendment immunity and not a "person" under the FCA, and we affirm the decision of the district court.

**AFFIRMED.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

April 21, 2022

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  20-13448-BB
Case Style:  USA, et al v. The Florida Birth-Related, et al
District Court Docket No:  0:19-cv-61053-WPD

Electronic Filing

All counsel must file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Although not required, non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing are available on the Court's website. Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, <u>costs are taxed against the appellants</u>.

Please use the most recent version of the Bill of Costs form available on the court's website at <u>www.ca11.uscourts.gov.</u>

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call <u>Tonya L. Richardson, BB</u> at <u>(404) 335-6174</u>.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna H. Clark
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs